UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SINGLE PATH SOLUTIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DELIVERHEALTH SOLUTIONS, LLC,<br><br>Defendant. | ) | Civil No. 24-11252-LTS |

MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT
(DOC. NO. 95) AND MOTIONS IN LIMINE (DOC. NOS. 99, 102, 106)

July 24, 2026

SOROKIN, J.

After the potential acquisition of Single Path Solutions, LLC by DeliverHealth Solutions, LLC fell through, Single Path sued, alleging fraud, breach of contract, trade-secrets misappropriation, and other related claims. After discovery, DeliverHealth moved for summary judgment on all claims. Doc. No. 95.[1] The summary-judgment motion, along with three accompanying motions in limine, are fully briefed. The Court heard oral argument on June 17, 2026. For the reasons that follow, DeliverHealth's motion for summary judgment is ALLOWED IN PART and DENIED IN PART, and the motions in limine are ALLOWED.

[1] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header or to paragraph numbers where applicable.

# I. BACKGROUND

## A. Facts[2]

Single Path is a limited liability company composed of three members: Russ Curran, Laura Ross, and Michael Pollock. Doc. No. 128-1 ¶ 1. Curran, Ross, and Pollock founded Single Path in the spring of 2020. Id. Single Path focused on developing a "pre-bill" revenue-integrity product for the healthcare industry that would use "autonomous coding" to "automat[e] insurance coding from the outset . . . [to] ensur[e] compliance, optimiz[e] earned reimbursement, reduc[e] costs and reduc[e] time." Id. ¶¶ 12, 14–15. ("Pre-bill" is an "industry term for after the patient has been seen, but before the bill has been submitted to insurance." Id. ¶ 12.)

In late September 2020, Curran first connected with Michael Clark, then the leader of Nuance Communications, Inc.'s healthcare division. Id. ¶ 19. Clark and Curran discussed opportunities for Single Path and Nuance to collaborate. See, e.g., Doc. No. 123-76 ¶¶ 9–18 (Curran declaration), cited in Doc. No. 128-1 ¶ 22 (Single Path response); Doc. No. 123-10 (Curran–Clark text messages dated Oct. 2–22, 2020), cited in Doc. No. 128-1 ¶ 19 (Single Path

---

[2] The Court draws these facts from the parties' unified statement of material facts, Doc. No. 128-1, and record evidence cited therein, drawing all reasonable inferences in favor of Single Path. One note about the factual record bears mention. Single Path purports to "dispute" more than 150 of DeliverHealth's 243 statements of fact. See generally id. But some of these "disputes" are not truly contested, see, e.g., id. ¶¶ 1, 144, and others are filled with narrative and legal argument (which the Court disregards) but no dispute that the asserted fact is true, see, e.g., id. ¶ 54. Take the first fact as a representative example of these pervasive issues. DeliverHealth stated that the members founded Single Path "on or about May 2020." Id. ¶ 1. Single Path "dispute[s]" this fact, countering that while Curran and Pollock testified that Single Path was created in May 2020, Ross testified it was created in "approximately the spring of 2020." Id. Of course, "approximately the spring of 2020" could reasonably mean "on or about May 2020," particularly considering the other testimony. Moreover, the difference (if there is one) between "on or about May 2020" and "the spring of 2020" has no effect whatsoever on the resolution of the pending motion or the case. This is not a genuine dispute and borders on vexatious litigation practice. Asserting that a fact is "disputed" does not make it so. The Court applies the familiar summary-judgment lens to the record and notes true disputes as relevant to its analysis.

response). Clark twice met with the Single Path members to discuss Single Path's "future functionality" and opportunities to integrate with Nuance's platform. Doc. No. 123-76 ¶¶ 10–11.

On November 19, 2020, Clark notified Curran that Nuance was spinning out its services business "to PE" (i.e., private equity), with Clark as CEO of the new entity, remarking that the move would "eliminate all the bureaucracy" and allow Clark and Curran to "get working together supporting Simplepath [sic]." Doc. No. 128-1 ¶ 33; see also Doc. No. 123-12 (Curran–Clark text messages). The Nuance spin-out became DeliverHealth. DeliverHealth was created by Assured Health Partners ("AHP") and Aeries Technology Group, formed under the laws of Delaware on November 9, 2020, and formally launched, with Clark as its CEO, in early March 2021. Doc. No. 128-1 ¶¶ 32–34; Doc. No. 97-61 at 4, cited in Doc. No. 128-1 ¶ 33.

According to Curran and Pollock, between November 2020 and January 2021, Clark urged them to stop building Single Path's platform and focus on integrating with DeliverHealth's network. Doc. No. 123-76 ¶¶ 13–19; Doc. No. 123-77 ¶¶ 7–11 (Pollock declaration), cited in Doc. No. 128-1 ¶ 69 (Single Path response). He touted DeliverHealth as having the "infrastructure" and "plumbing" in place for Single Path's revenue-integrity system to operate. Doc. No. 123-76 ¶ 15. Curran says he told Clark that if their companies could come to a financially satisfactory agreement, Single Path would "terminate its building of an independent" revenue-integrity system and "go all in with" DeliverHealth. Id. ¶ 17. At inception, DeliverHealth did not have a pre-billing system; the parties dispute whether DeliverHealth now does (or markets itself as doing) "autonomous coding." Doc. No. 128-1 ¶ 35.

In early 2021, Single Path was in the process of building a minimum viable product ("MVP"). Id. ¶ 25 (Single Path response) (citing Doc. No. 97-131 (Pollock deposition)). Curran told Ross and Pollock that defining Single Path's MVP was a key next step in their collaboration

with DeliverHealth. See Doc. No. 97-45 at 2 (Curran email to Ross and Pollock dated Feb. 1, 2021) (reporting that Curran had "a great call with [Clark]" and that as a next step "we need to define what is a[n] MVP"), cited in Doc. No. 128-1 ¶ 31.[3]

On March 1, 2021, Clark became the CEO of DeliverHealth. Doc. No. 128-1 ¶ 33. On March 10, DeliverHealth and Single Path signed a mutual nondisclosure agreement ("NDA"). Id. ¶ 39. Under the NDA, the parties agreed to "share information . . . relating to their respective operations in order to identify and evaluate potential business opportunities." Id.; Doc. No. 123-32 ¶ 1 (signed NDA). Each party agreed to use the other's confidential information only for this purpose. Doc. No. 123-32 ¶ 6. The NDA did not "limit[] either Party or its Affiliates from entering into any business relationship." Id. ¶ 9.

On March 25 and 26, the Single Path members convened with Clark and other DeliverHealth employees for an "all-hands" meeting to discuss strategic collaboration opportunities. Doc. No. 128-1 ¶¶ 34, 37, 47. During this meeting, the Single Path members gave presentations on problems in the "healthcare revenue integrity process" and explained how Single Path's revenue-integrity solution could integrate into DeliverHealth's system to "bring [DeliverHealth] to the forefront of the revenue integrity space." Doc. No. 123-76 ¶¶ 23–29, cited in Doc. No. 128-1 ¶ 34. Clark considered the meeting a success. Doc. No. 128-1 ¶ 37 (Single Path response). Around this time, Single Path shared some of its source code and other intellectual property with DeliverHealth via a flash drive. Id. ¶¶ 93, 106.

---

[3] In addition to defining Single Path's MVP, the identified next steps were to "put together [a] time line and approximate costs for what [Clark] termed a craw[l] walk run approach." Doc. No. 97-45 at 2. Curran's February 1 email continued: "The PE investors want to turn the business and have a liquidity event in 48 to 60 months. MVP I think should be the ability to ingest data, run rules and provide simple [E]xcel reports and view of raw data. This would be followed with incremental additions leading to ABC. Need your all's help here." Id.

On March 28, 2021, Clark and Curran orally agreed[4] that DeliverHealth would purchase Single Path pursuant to a "cashless 'employee model' format" in which, in exchange for "all [Single Path] assets," DeliverHealth would provide Single Path members with equity interest in DeliverHealth "ownership units" and a "performance based 'earn out' of units" in DeliverHealth based on the "growth and performance of [DeliverHealth] moving forward." Id. ¶¶ 55–56; Doc. No. 97-124 at 5 (Single Path interrogatory response), cited in Doc. No. 128-1 ¶ 55. Under the agreement, all Single Path members would be hired by DeliverHealth "on dates to be determined." Doc. No. 128-1 ¶¶ 55, 58; Doc. No. 97-124 at 6. No valuation or price was then established. Doc. No. 128-1 ¶ 57; see also Doc. No. 97-124 at 5; Doc. No. 97-133 at 251 (Curran deposition), cited in Doc. No. 128-1 ¶ 55 (Single Path response). This verbal agreement was never memorialized in a final written agreement. Doc. No. 128-1 ¶ 60.

Over the next few days, Clark requested a meeting with Curran to "follow up on the business relationship path" and to "catch up live on next steps relationship and approach as we go toward employee model." Doc. No. 123-10 (Curran–Clark emails dated Mar. 30–31, 2021), cited in Doc. No. 128-1 ¶ 34 (Single Path response). Curran requested that he and Clark work on "framing our relationship" before looping in Ross and Pollock; Clark agreed that "[i]t'll be you & I agree in principle then I'll bring back [Sasanka Yella Manchali, DeliverHealth's Chief Operating Officer] and then we will get you to know our couple principal investors" and assured Curran that "all can be accomplished by 4/15." Doc. No. 97-56 (Curran–Clark text messages on Mar. 30, 2021), cited in Doc. No. 128-1 ¶ 61.

[4] DeliverHealth disputes that the parties formed an oral agreement, but for purposes of its summary-judgment motion, the Court accepts Single Path's version of events.

In early April 2021, Curran sent Clark a draft of an "Exclusive Technology License and Distribution Agreement," which proposed to govern DeliverHealth's license of Single Path's technology. Doc. No. 128-1 ¶¶ 62–63. Clark circulated the draft to several DeliverHealth employees. Doc. No. 97-58, cited in Doc. No. 128-1 ¶ 64. Curran later testified that he did not expect Clark to sign this agreement; instead, he sent it because he was "[t]rying to kick [Clark] in the ass and get him going" on the acquisition. Doc. No. 128-1 ¶ 62; Doc. No. 97-133 at 269–74. The parties never executed this (or any other) licensing agreement. Doc. No. 128-1 ¶ 66.

Around the same time, DeliverHealth created a shared folder with Single Path on Confluence, a file-sharing platform. Id. ¶¶ 76–77. Over the following six months, Ross and Pollock uploaded materials to the Confluence folder, including "materials labeled epic extract code, SPS data validation rules, Python source code, SPS rules engine design, SPS rules and algorithm, and SPS Billing Audit Workflow." Id. ¶ 90; see also id. ¶ 1 (abbreviating "Single Path Solutions, LLC" as "SPS"); Doc. No. 123-75 ¶¶ 22, 23 (Ross declaration), cited in Doc. No. 128-1 ¶ 90 (Single Path response); Doc. No. 123-77 ¶¶ 28, 30, 32, 35.

Beginning in May 2021, Ross and Pollock began transferring their revenue-integrity knowledge to DeliverHealth employees, an effort that ultimately consumed "thousands of hours." Doc. No. 123-77 ¶ 27, cited in Doc. No. 128-1 ¶ 25 (Single Path response). For example, on May 17, Pollock spent "hours" training the DeliverHealth engineering team on topics like structuring hospital and physician data. Id. ¶ 34. In August 2021, Ross and Pollock taught new DeliverHealth employees about Single Path's revenue-integrity processes and how to market those solutions to healthcare providers. Id. ¶ 39; Doc. No. 123-75 ¶ 29. These efforts continued during an October 18 and 19 meeting at Curran's home, where Ross, Curran, and Pollock taught several members of the DeliverHealth team "Rules Education, Coding Workflow

Requirements, [Single Path] Workflows, Common Path Coding Workflow, Rules and the Rules Engine, how they work, what they do, how the [Single Path] original algorithmic rules function, how to integrate [Single Path] into the current [DeliverHealth] environment, and how to best market and position the [Single Path revenue-integrity] system." Doc. No. 123-75 ¶ 35; accord Doc. No. 123-76 ¶ 53; Doc. No. 123-77 ¶ 45. Ross also sent revenue-integrity "best practices" to a few DeliverHealth employees, Doc. No. 123-75 ¶ 38, and Ross and Pollock helped to evaluate other business opportunities DeliverHealth was considering, id. ¶¶ 40–41; Doc. No. 123-77 ¶¶ 47–48. In November 2021, Ross and Pollock analyzed DeliverHealth's potential partnership with or acquisition of a company called Presidio Health; they concluded Presidio was "not operating in the revenue integrity arena nor were they advertising any such capabilities online." Doc. No. 123-75 ¶¶ 41, 56; Doc. No. 123-77 ¶ 47.

In May 2021, Single Path helped prepare and approved materials Clark used to reach out to a consultant who worked for Providence Healthcare Health and Services, a DeliverHealth customer. Doc. No. 128-1 ¶¶ 84–85. According to Curran, Clark used the materials to get "clarity" from the consultant about "selling" Single Path's revenue-integrity product to clients like Providence. Doc. No. 97-133 at 293–95, cited in Doc. No. 128-1 ¶ 85.

In August 2021, the Single Path members expressed their concerns that the March 28 agreement between Clark and Curran had not yet been finalized in writing. Doc. No. 128-1 ¶ 88 (Single Path response); see also Doc. No. 123-75 ¶¶ 30–31; Doc. No. 123-76 ¶¶ 48–49. To assuage their concerns, Jason Martin (DeliverHealth's Chief Product Officer) flew to Denver to meet with Ross and Curran, where he "assured" them of DeliverHealth's "commitment to" the purchase agreement. Doc. No. 123-75 ¶ 32; Doc. No. 123-76 ¶¶ 44, 50.

In September 2021, Clark and Curran "conferred regarding the terms of the [p]urchase [a]greement" and resolved that DeliverHealth would hire the Single Path members by November 2021. Doc. No. 123-76 ¶ 52. In early November, on an email thread discussing Ross and Pollock's hiring, Martin explained to several DeliverHealth colleagues that DeliverHealth was "already working with" Ross and Pollock, and he further noted that their employment offer did not include an equity component, writing:

> The offer for [Ross] and [Pollock] only includes salary plus a start bonus to adjust for the hour[s] they have already contributed (approx. total of 10K each). They both understand that the equity component has not been resolved, but are willing to move forward.

Doc. No. 123-23 at 1 (emails dated Nov. 2–3, 2021), cited in Doc. No. 128-1 ¶ 197 (Single Path response).

On November 15, Martin sent Curran, Ross, and Pollock an email with subject line "IP Protection Clause" that proposed adding language to their job-offer letters stating, in part, that any intellectual property developed for Single Path would remain Single Path's property "until the IP and other relevant assets are acquired by Deliver Health," and that "[a]ny [Single Path] employee that joins Deliver Health prior to the acquisition will have the option to transition back to [Single Path] in the event Deliver Health does not successfully acquire the IP and assets." Doc. No. 97-84 at 2, cited in Doc. No. 128-1 ¶¶ 198–199. The next day, Curran replied all: "Looks great Jason thanks!" Doc. No. 128-1 ¶ 200; Doc. No. 97-84 at 2. The language in question was not ultimately placed in the offer letters. Doc. No. 128-1 ¶ 198 (Single Path response) (citing Doc. Nos. 123-63, -64 (offer letters)).

DeliverHealth hired Ross and Pollock in November 2021. Doc. No. 128-1 ¶¶ 198–201; see also Doc. No. 123-75 ¶ 43; Doc. No. 123-64 at 3. Neither offer letter contained an equity

component. Doc. Nos. 123-63, -64. Curran's hiring was scheduled for March 4, 2022. Doc. No. 128-1 ¶ 198 (Single Path response).

In early November, Clark, Martin, and Curran collaborated on drafting a "business case"—a document that pitched DeliverHealth's acquisition of Single Path to DeliverHealth's investors. Id. ¶¶ 187–196. On November 3, Clark emailed Martin and Yella Manchali a "framework" for the acquisition of Single Path. Doc. No. 97-79, cited in Doc. No. 128-1 ¶ 187. The framework was a draft of the presentation Clark would give to investors and the board about the Single Path acquisition. Id. It included placeholders like, "[v]aluation methodology and valuation TBD," and, "DeliverHealth will offer some kind and combination of (i) equity ownership shares . . . equal to some X% of current year one value[,] (ii) performance based 'earn out' of shares . . . over a TBD 3–5 year timeframe, . . . and/or (iii) for certain individuals participation in the [DeliverHealth] Management Incentive Plan." Id. Clark also told Martin and Yella Manchali they would need to "get together swiftly on how we value the assets and if/when [Curran] comes back with a valuation ($xx, $YYY, etc) we have somewhat of a threshold we want to live within." Id., cited in Doc. No. 128-1 ¶ 188.

On November 10, Curran emailed Martin a draft summary of the "problem" Single Path aimed to solve, an industry background and landscape, and the "opportunity" presented. Doc. No. 97-80 at 2–4, cited in Doc. No. 128-1 ¶ 190. He asked to discuss his draft with Martin "to see if I am helping or hurting our cause," explaining, "I don't know the other side (VC)." Id. The next day, Martin sent Curran a "V1" of the business-case document as the "latest version to work from." Id. That first version reflected Clark's framework, including his placeholders like shares "equal to X% of current year one value" and listing "valuation methodology and purchase value" as one of several "outstanding items." Doc. No. 123-52 at 2 (citation modified), cited in

Doc. No. 128-1 ¶ 189 (Single Path response). Curran revised the business-case document through November 18, 2021. Doc. No. 128-1 ¶ 194.

In late November, Martin and Clark planned to meet with Curran to discuss the "model." Doc. No. 123-66 at 2, cited in Doc. No. 128-1 ¶ 195 (Single Path response). Martin told Clark that Curran had given him a "right [sic] up, but no # tied to the value." Id. On December 1, Clark told Martin he had read the business case and that he planned to "nail [Curran] down f2f" (i.e., face to face). Doc. No. 123-67 at 2, cited in Doc. No. 128-1 ¶ 195 (Single Path response).

The next day, December 2, 2021, Clark and Curran did meet face to face. Doc. No. 128-1 ¶ 203. Curran took notes during the meeting. Id. ¶ 205 (Single Path response) (citing Doc. No. 123-51). During that meeting, according to Curran, Clark proposed that the Single Path members would receive "$10 million in equity ownership units pari-passu to the AHP investment, a performance based 'earn out' of units in [DeliverHealth] based on growth and performance moving forward, and participation in the [DeliverHealth] Management Incentive Plan." Id. ¶ 207; Doc. No. 97-124 at 6. The $10 million stake would have given Single Path a 15% ownership interest in DeliverHealth. Doc. No. 128-1 ¶ 207; Doc. No. 97-124 at 6. The Single Path members accepted the proposal that day. Doc. No. 97-124 at 6. This agreement was not, however, memorialized in writing.

Over the next few weeks, Curran and Clark exchanged messages that illustrate they anticipated the acquisition would be governed by a finalized written contract. On December 6, Curran texted Clark, "Let me know what you need me to do so we can paper our deal." Doc. No. 97-89 at 2, cited in Doc. No. 128-1 ¶ 209. Three days later, he followed up, "Any [luck] getting your hands on that agreement we discussed?" Id. Clark apologized for the delay and explained: "I'll outline in email key components and steps we discussed w[ith] our investors the agreement

is straightforward (to not complicate how they perceive deals of this type). What I'll outline is the formal steps that swiftly get us to deal[.] We have a board mtg 12/15 next week focused on yr end and FY22 which this is strategic part." Doc. No. 128-1 ¶ 209. Curran replied, "I know you['re] busy as heck I just want to get on board and start to run!" and "Thanks." Id. ¶ 210. Clark then responded, "Too though I've got to formalize this with Term Sheet that informs formal agreement which I'll work with Jason [Martin] and Sy [Yella Manchali]—it's not hard." Id. ¶ 211. Curran responded, "Thanks!" Id. Clark then said, "Back to you tomorrow with high level draft [and] outline to then take to Term Sheet to then take to AHP w[ith] Business Case you & Jason worked." Id. ¶ 212. Then, a few minutes later, "I'd suggest following tomorrow we get you term sheet framework and detail. This weekend you me Jason Sy align on it. Monday I go to AHP then next week in feedback we work to finalize LOI and move to Agreement and close by end of Jan—given there is legal work to be done." Id. ¶ 212; see also Doc. No. 97-89 at 3. Curran replied, "I like it." Doc. No. 128-1 ¶ 212.

Three days later, Clark followed up to again apologize for not getting back to Curran sooner, explaining, "We are working written term sheet and had timing challenge triangulating Jason, Sy, me . . . [s]o we are off by 2–3 days." Doc. No. 97-89 at 3. Curran replied, "No problem we are headed in the right direction." Id. On December 24, Clark messaged Curran, "Separate from all others let's talk [Monday] or [Tuesday] have run into valuation challenges method what's what etc so no show stopper just need to grind through." Doc. No. 128-1 ¶ 214; Doc. No. 97-94 at 2. Curran responded, "You name the time and I am there." Id. According to Curran, despite verbal assurances from Martin in January and February 2022 that DeliverHealth was working on finalizing the deal, the promised term sheet never materialized, nor was a written agreement ever prepared. Doc. No. 123-76 ¶ 76.

In January 2022, Martin directed Ross and Pollock to share "proprietary [Single Path] trade secret information" with Presidio—the company they had earlier helped evaluate, and whose acquisition DeliverHealth was considering. Doc. No. 128-1 ¶ 208 (Single Path response); Doc. No. 123-75 ¶¶ 57–58; Doc. No. 123-77 ¶¶ 62–63. Ross and Pollock did not share any Single Path intellectual property with Presidio. Doc. No. 123-75 ¶ 59; Doc. No. 123-77 ¶ 64. Instead, they worked with Presidio's Chief Technology Officer to test whether Single Path's rules "could be applied to provider data using the Presidio system." Doc. No. 123-75 ¶ 60; Doc. No. 123-77 ¶ 65. The test was a success. Doc. No. 123-75 ¶ 60; Doc. No. 123-77 ¶ 65. On February 7, 2022, Pollock (with other DeliverHealth employees) met with the Presidio CTO to discuss how Presidio's software could "accelerate the integration" of the Single Path revenue-integrity system into DeliverHealth's platform. Doc. No. 123-77 ¶ 69.

In late February 2022, Clark informed Curran that DeliverHealth would not move forward with its acquisition of Single Path. Doc. No. 128-1 ¶¶ 228, 242. Clark drafted talking points for his conversation with Curran, which explained that financial pressures had prompted the board to ask management to "narrow [its] focus" and had forced certain "trade offs"—ultimately driving DeliverHealth's decision not to invest in Single Path during fiscal year 2022. Doc. No. 123-71, <u>cited in</u> Doc. No. 128-1 ¶ 228 (Single Path response). Clark communicated these talking points to Curran, telling him DeliverHealth "was having financial issues and had to make a 'trade-off.'" Doc. No. 123-76 ¶ 89, <u>cited in</u> Doc. No. 128-1 ¶ 242 (Single Path response). The trade-off was "the purchase of Presidio instead of" Single Path. <u>Id.</u>

On March 3, 2022, DeliverHealth terminated Ross and Pollock's employment. Doc. No. 128-1 ¶ 243. DeliverHealth presented them with separation and release agreements; they refused

to sign because, among other reasons, Pollock did not want to "relinquish our intellectual property to DeliverHealth that easily." Id. ¶¶ 231, 235–236; Doc. No. 97-131 at 129.

B. Procedural Posture

On April 19, 2023, Single Path filed suit in the U.S. District Court for the District of Colorado, alleging fraudulent and negligent misrepresentation, breach of contract (regarding the purchase agreement and the NDA), promissory estoppel, breach of the implied covenant of good faith and fair dealing, trade-secret misappropriation, and unjust enrichment. Doc. No. 1. The federal court in Colorado granted DeliverHealth's motion to transfer venue due to the NDA's forum-selection clause, transferring the case here. Doc. Nos. 19, 38. This Court denied DeliverHealth's motion to dismiss, Doc. Nos. 18, 61, and the parties conducted discovery.

On November 10, 2025, DeliverHealth moved for summary judgment on all claims. Doc. No. 95. DeliverHealth also moved to exclude the opinions of two of Single Path's experts. Doc. Nos. 99, 102. Single Path, for its part, moved to exclude one of DeliverHealth's expert opinions and strike undisclosed documents he relied on. Doc. No. 106. All motions are fully briefed, and the Court held oral argument on June 17, 2026.

II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Rsch. Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to []view the record in the light most favorable to the nonmoving party"—here, Single Path—"and to draw all reasonable inferences in the

nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (citation modified). A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

DeliverHealth moves for summary judgment on all claims. The parties' briefing begins with the claim alleging breach of the purchase agreement (Count III), then otherwise proceeds in the sequence set out in the complaint. The parties rely on Massachusetts law for Single Path's state common-law claims, as they did on the motion to dismiss. The Court follows suit.

### A. Count III: Breach of Purchase Agreement

Single Path alleges DeliverHealth breached the parties' contract for DeliverHealth to purchase Single Path. The elements of a Massachusetts breach of contract claim are: "(1) the existence of the contract, (2) the plaintiff's willingness to perform or performance, . . . (3) breach by the defendant," and in a damages case, (4) "causation and the amount of damages." Amicas, Inc. v. GMG Health Sys., Ltd., 676 F.3d 227, 231 (1st Cir. 2012). The first element is dispositive here. The summary-judgment record establishes that the parties failed to form an enforceable contract for DeliverHealth's acquisition of Single Path and that Clark lacked authority to unilaterally bind DeliverHealth to the acquisition in any event.

The Court understands Single Path as advancing three theories for when and how the parties formed a purchase agreement. See Doc. No. 127-1 at 5–11. First, that Clark and Curran reached an agreement on March 28, 2021. Id. at 7. Second, that the parties reached initial agreement on a deal framework on March 28, then filled in the remaining key terms over the

following months, culminating when Clark and Curran agreed on a purchase price on December 2, 2021. Id. at 5–8. Third, that the parties formed an implied-in-fact contract through the course of their dealings. Id. at 5, 9–11. As the Court will explain, all three fail as a matter of law.

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass. 2000). Although it is not necessary that "all terms of the agreement be precisely specified," the parties must "have progressed beyond the stage of imperfect negotiation." Id. (citation modified). To determine whether the parties have formed a contract, the "controlling fact is the intention of the parties." McCarthy v. Tobin, 706 N.E.3d 629, 631 (Mass. 1999).

Indefiniteness and open-endedness are indicia that parties did not intend to be bound. "[E]xtreme vagueness" in a purported contract's terms not only "make[s] its enforcement impossible" but also "indicates that there was no intent to be bound, and thus no agreement, in the first place." Lambert v. Fleet Nat'l Bank, 865 N.E.2d 1091, 1096 (Mass. 2007). "The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement." Id. (quoting Restatement (Second) of Contracts § 33 cmt. c (A.L.I. 1981)).

The complexity, scale, and subject-matter of the transaction may also indicate parties did not intend to be bound to their oral or preliminary negotiations. If the nature of the transaction is such that "one would ordinarily expect [it] to be set forth in a carefully written document," that fact may "justif[y] the strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled." Id. at 1097 (citation modified). Parties' "contemplat[ion] [of] the execution of a final written agreement" likewise typically effects a "strong inference that the parties do not intend to be bound by earlier negotiations or

agreements until the final terms are settled." Rosenfield v. U.S. Tr. Co., 195 N.E. 323, 325 (Mass. 1935). If the parties have agreed to "all the material terms," however, a court may infer that the anticipated writing is "a mere memorial of the contract already final by the earlier mutual assent of the parties to those terms." Id.

Single Path asserts that, on March 28, 2021, Clark and Curran orally agreed that DeliverHealth "would purchase" Single Path "pursuant to a cashless 'employee model' format," in which, in exchange for "all [Single Path] assets," DeliverHealth would provide Single Path members with "equity interest in ownership units" in DeliverHealth as well as "a performance based 'earn out' of units" in DeliverHealth, and would hire the Single Path members at "dates to be determined." Doc. No. 97-124 at 5–6. DeliverHealth argues that this March 28 oral agreement lacked at least three essential terms: (1) what assets or entity DeliverHealth was purchasing, (2) what consideration DeliverHealth would provide, and (3) the duration and timing of DeliverHealth's employment of the Single Path members. Doc. No. 96-1 at 11. Single Path does not dispute that these terms were material, but it argues there is a genuine dispute of material fact as to whether the parties had reached agreement on each. Doc. No. 127-1 at 5–11.

No reasonable jury could conclude that, as of March 28, 2021, the parties had progressed beyond the stage of "imperfect negotiation" to reach agreement on all material terms. Situation Mgmt. Sys., 724 N.E.2d at 703 (citation modified). Most importantly, the parties had not agreed on the consideration DeliverHealth would provide in exchange for Single Path or its assets. According to Single Path, Clark offered that DeliverHealth would provide Single Path members with equity in DeliverHealth along with a performance-based earn-out of units. Doc. No. 97-124 at 5. Even accepted as true, this statement raises more questions than it answers. How much equity would the Single Path members receive, and at what valuation? What share class would

they receive? When would their equity vest? Would the performance-based earn-out be in addition to or a component of the upfront equity? What performance would trigger the earn-out?

The summary-judgment record shows that all these questions were unanswered on March 28, 2021. Single Path concedes there was no valuation or price at that time. See Doc. 128-1 ¶¶ 57–58 (Single Path response) (acknowledging equity amount was negotiated in December 2021); Doc. No. 97-124 at 5–6, 8 (same); Doc. No. 127-1 at 8 (same). Nor did the parties agree, on or before March 28, to a valuation formula, benchmark, or other means by which a reasonable price term might be implied.[5] The indefiniteness of the consideration is strong evidence the parties lacked an intention to be bound by the purchase agreement on March 28, 2021. See Lambert, 865 N.E.2d at 1096.

It is true that, "where a binding agreement has been established, it will not necessarily fail because of the indefiniteness of one or more terms, especially where one party has already performed." Id. (citing Silver v. Graves, 95 N.E. 948 (Mass. 1911)). But in "such cases, the question is not, as it is here, whether a contract existed at all, but whether an admittedly binding contract was nonetheless 'too indefinite to be enforced.'" Id. (quoting Cygan v. Megathlin, 96 N.E.2d 702, 704 (Mass. 1951)). Here, the open-endedness of so many material terms meant no reasonable jury could conclude a contract existed as of March 28, 2021.

Several material terms were resolved or clarified over the following nine months. Two Single Path members (Ross and Pollock) were hired by DeliverHealth in November 2021, and Curran's hiring was scheduled for March 4, 2022. Doc. No. 128-1 ¶¶ 198–201. Crediting Single

[5] Pollock (another Single Path member) testified at his deposition that, at some point, Clark "assured" Single Path "it would be a fair valuation . . . in the ballpark of $10 to $15 million." Doc. No. 97-131 at 164–65. He did not specify when that statement was made, and Single Path does not contend it was made on or before March 28, 2021.

Path's version of events, Curran and Clark agreed on both a price—$10 million—and a share class—"pari-passu to the AHP investment"—on December 2, 2021. Id. ¶ 207. Some other terms, such as the conditions of the performance-based earn-out, remained indefinite.

Even with an agreed-upon price, however, the surrounding circumstances strongly suggested that the parties remained locked in negotiations with an eye toward consummating a final, detailed written contract.

The nature of the purported transaction strongly supports this conclusion. A $10 million, equity-based acquisition of one company by another is plainly the type of agreement one expects to be put in writing. These parties' contemplated deal would involve the transfer of Single Path's intellectual property, presenting complicated issues for which the fine details—who owned what, when, and what value the parties placed on it—would matter a lot. This was the kind of transaction parties typically finalize in a carefully written document. See Lambert, 865 N.E.2d at 1096–97; see also TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 136 (1st Cir. 2007) ("Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements." (quoting Tull v. Mister Donut Dev. Corp., 389 N.E.2d 447, 451 (Mass. App. Ct. 1979))). These parties reflected this commonsense expectation as they drafted a detailed business-case document and discussed the need for a term sheet, a letter of intent, and more than a month of lead time for the "legal work to be done" before an agreement would be finalized. Doc. No. 128-1 ¶¶ 187–196, 209–214.

The summary-judgment record shows that the parties contemplated executing a final written agreement—further evidence they did not expect to be bound to their oral discussions. Rosenfield, 195 N.E. at 325. In early April 2021, Curran sent Clark a draft "Exclusive Technology License and Distribution Agreement" in order to prod Clark to "get . . . going" on

the purchase agreement, showing Single Path believed more was needed for the deal to be finalized. Doc. No. 128-1 ¶¶ 62–63; Doc. No. 97-133 at 269–77. In August 2021, the Single Path members voiced concerns that the March 28 agreement still had not been finalized in writing. Doc. No. 123-75 ¶¶ 30–31; Doc. No. 123-76 ¶¶ 48–49. On December 6, 2021—after Clark and Curran's discussion of a purchase price—Curran again reached out to Clark about what he could do "so we can paper our deal," asking whether Clark had "gotten [his] hands on [the] agreement we discussed" and expressing that he "just want[ed] to get on board and start to run." Doc. No. 128-1 ¶¶ 209–210; Doc. No. 97-89 at 2. Clark, in response, repeatedly advised Curran they needed to "formalize" their agreement with a term sheet, letter of intent, and formal agreement, and noted that "there is legal work to be done." Doc. No. 128-1 ¶¶ 211–212; Doc. No. 97-89 at 2–3. The parties consistently articulated their expectation that the purchase agreement would be finalized in an executed written agreement—and Single Path's members repeatedly expressed their anxiety that such a final written agreement had not been reached. It is undisputed that the acquisition agreement was never memorialized in a final written contract. Doc. No. 128-1 ¶ 66. Under these circumstances, the parties did not manifest an intent to be bound to their discussions on March 28, on December 2, or along the way in between.

Alternatively, even assuming Clark and Single Path eventually reached binding agreement on all key terms of the purchase agreement (a conclusion the Court rejects on the summary-judgment record), Count III nevertheless fails as a matter of law because Clark lacked actual or apparent authority to bind DeliverHealth to the acquisition.

"An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1119 (Mass. 2000). When

an agency relationship exists, a principle is liable for an agent's conduct "toward third parties only if the agent was acting with the actual or apparent authority of the principal in that transaction." Id. at 1120 (citing Restatement (Second) of Agency §§ 7, 8 (A.L.I. 1958)).

Whether express or implied, actual authority arises from the principal's manifestations to the agent. Id. at 1120 & n.13. Here, there is no real dispute that Clark lacked actual authority to unilaterally bind DeliverHealth to the acquisition of Single Path. In his deposition, Clark specifically disclaimed having such authority. Doc. No. 128-1 ¶ 50. Single Path adduces no evidence showing or suggesting that, in fact, DeliverHealth had conferred this authority on Clark at the time he discussed Single Path's acquisition with Curran. For instance, Single Path points to no evidence in the record that DeliverHealth's investors or board of managers knew of Clark's offer to purchase Single Path, let alone that they acquiesced in that acquisition. See Theos & Sons, 729 N.E.2d at 1120 (no actual authority where, among other things, plaintiff "proffer[ed] no evidence that [principal] knew of, or consented to," certain activity by agent, "much less that [principal] wanted [agent]" to engage in that activity "on [principal's] behalf and authorized [agent] to do so").

Single Path points only to a text message from Clark to Curran in November 2020—when Clark told Curran that he was becoming CEO of a newly created, private equity–backed spinout from Nuance—in which Clark stated that his new role would enable Clark and Curran to "eliminate all the bureaucracy and get working together supporting Simplepath [sic]." Doc. No. 128-1 ¶ 50 (Single Path response). Even if Clark believed—before he was formally installed as DeliverHealth's CEO—that he could "eliminate all the bureaucracy," that belief does not show that, once he was in the role, DeliverHealth actually conferred on Clark the authority to engage in transactions of this nature without additional approval. Clark and Curran's monthslong

negotiations illustrate that Clark understood he could not make a unilateral acquisition and had to "go to" DeliverHealth's investors for approval, even if doing so was "not hard." See Doc. No. 97-56; Doc. No. 128-1 ¶¶ 209–214; cf. Doc. No. 128-1 ¶¶ 187–196 (discussing business case for investors). In short, Single Path has not proffered evidence sufficient to raise a jury question as to Clark's actual authority to unilaterally bind DeliverHealth to the acquisition of Single Path.

"Under Massachusetts law, apparent authority is that authority resulting from conduct by the principal which causes a third person reasonably to believe that a particular person has authority to make representations as his agent." Veranda Beach Club Ltd. P'ship v. W. Sur. Co., 936 F.2d 1364, 1377 (1st Cir. 1991) (citing Hudson v. Mass. Property Ins. Underwriting Ass'n, 436 N.E.2d 155, 159 (Mass. 1982)). "Critically, only the words and conduct of the principal, and not those of the agent, are considered in determining the existence of apparent authority." Fergus v. Ross, 79 N.E.3d 421, 425 (Mass. 2017) (citation modified). Titles and trappings of an office may be indicia of apparent authority, but they generally do not, on their own, establish apparent authority. Kanavos v. Hancock Bank & Tr. Co., 439 N.E.2d 311, 315 (Mass. App. Ct. 1982). Any presumption about the scope of a corporate officer's authority does not extend to situations requiring a grant of specific authority, such as "the sale of a major asset by a corporation or a transaction which by its nature commits the corporation to an obligation outside the scope of its usual activity." Id. at 316 (citing Bloomberg v. Greylock Broadcast Co., 174 N.E.2d 438, 441–42 (Mass. 1961)); see also Restatement (Third) of Agency § 2.03 cmt. d (A.L.I. 2006) (noting that when a transaction is "extraordinary" or "novel" in its subject matter or scale, third party may lack reasonable belief that transaction is within scope of agent's authority).

Clark, whom DeliverHealth installed as its CEO, might have possessed apparent authority to bind the company in certain transactions regularly arising with the scope of his

duties as chief executive. But, just by giving Clark the title of CEO, DeliverHealth did not manifest to Single Path its authorization for Clark to grant a 15% ownership stake in the company in order to expand the business into a service line it did not then occupy (i.e., pre-bill revenue integrity). This acquisition was the kind of "extraordinary" transaction that a reasonable person in Single Path's position would know was beyond the scope of the CEO's authority, absent a specific grant of authority by DeliverHealth. See Restatement (Third) of Agency § 2.03 cmt. d. Here, no reasonable jury could find that DeliverHealth (or its majority investor, AHP) manifested to Single Path that Clark had that specific authorization.

The summary-judgment record compels this conclusion. At his deposition, Curran testified that he understood AHP was the majority investor in DeliverHealth and acknowledged that "when shares are issued to another party, that holders or the investors of the company have to approve that issuance." Doc. No. 97-133 at 389–90. Although Curran further testified to his belief, based on Clark's representations, that Clark had "full authority to make the offer" to acquire Single Path, id., this latter testimony is undermined by Clark's repeated statements (and Curran's contemporaneous acknowledgement) that investor approval was needed. See Doc. No. 128-1 ¶ 33 (Clark message Nuance was spinning out its services business "to PE," dated Nov. 19, 2020); Doc. No. 97-45 (Curran email to Ross and Pollock noting they needed to create an MVP and remarking that "[t]he PE investors want to turn the business and have a liquidity event in 48 to 60 months," dated Feb. 1, 2021); Doc. No. 97-56 (Clark message advising Curran he would "get to know our couple principal investors," dated Mar. 30, 2021); Doc. No. 97-80 (Curran email to Martin regarding draft business case, asking Martin to "see if I am helping or hurting our cause" because "I don't know the other side (VC)," dated Nov. 10, 2021); Doc. No. 128-1 ¶¶ 209–212 (Clark messages advising Curran that Clark would "outline . . . the formal

steps that get us swiftly to a deal" for discussion at upcoming board meeting, take business case and term sheet "to AHP," and "go to AHP" before finalizing letter of intent and purchase agreement, all dated Dec. 9, 2021). In any event, apparent authority is created by the manifestations of the principal, not its agent. Fergus, 79 N.E.3d at 425. Single Path points to no manifestations by DeliverHealth—aside from giving Clark the title of CEO—that conveyed Clark's apparent authority, and under these circumstances, the title is not enough.

Because Single Path has not raised a triable issue as to Clark's actual or apparent authority to unilaterally acquire Single Path on DeliverHealth's behalf, DeliverHealth cannot be held liable for any breach of the purchase agreement.[6]

For all these reasons, the motion for summary judgment is ALLOWED as to Count III.

B. Counts I and II: Fraudulent and Negligent Misrepresentation

Single Path next asserts claims of fraudulent and negligent misrepresentation. Under Massachusetts law, to establish fraudulent misrepresentation, a plaintiff must prove that: "(i) the defendants made a false representation of a material fact with knowledge of its falsity for the purpose of inducing him to act thereon, (ii) he relied upon the representation as true and acted upon it to his detriment, and (iii) that his reliance was reasonable under the circumstances." Rodi v. S. New England Sch. of L., 532 F.3d 11, 15 (1st Cir. 2008). "Unlike fraud, negligent

[6] In addition to the March 28 and December 2 "contracts," Single Path also argues that the purchase agreement can be implied from the parties' actions. See Doc. No. 127-1 at 5, 9–11. "In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties." John B. Cruz Constr. Co. v. Beacon Cmtys. Corp., 169 F.4th 89, 96 (1st Cir. 2026) (citation modified). DeliverHealth persuasively argues that Single Path waived this argument for failure to plead or allege an implied-in-fact contract until its brief opposing the motion for summary judgment. Doc. No. 135-1 at 7 n.3; see also Doc. No. 2 ¶¶ 282–301 (no allegation of implied-in-fact contract); Doc. No. 97-124 at 5–6 (no description of implied-in-fact contract in interrogatory response). The Court is dubious Single Path can proceed on this theory, but it need not conclusively determine whether the implied-in-fact theory is available because Clark lacked authority to bind DeliverHealth to the acquisition in any event.

misrepresentation does not require an intent to deceive or actual knowledge that a statement is false." Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 47 (Mass. 2009). A plaintiff asserting a negligent-misrepresentation claim must show, among other things, that the defendant "supplied false information for the guidance of others . . . in their business transactions" that "result[ed] in pecuniary loss . . . by their justifiable reliance upon the information." Cummings v. HPG Int'l, Inc., 244 F.3d 16, 24 (1st Cir. 2001).

"There is an important threshold determination for any misrepresentation claim," whether fraudulent or negligent: "only statements of fact are actionable; statements of opinion cannot give rise to" such an action. Id. at 21 (emphasis added). Although the reasonableness of a plaintiff's reliance typically is a jury question, if no reasonable jury could find the party's reliance reasonable and justified, a court may grant summary judgment for the defendant. Cumis Ins. Soc'y, 918 N.E.2d at 50; Rodi, 532 F.3d at 15.

Single Path points to five sets of statements as amounting to fraudulent and/or negligent misrepresentations: (1) Clark's statements between November 2020 and January 2021 pressing the Single Path members to stop building the Single Path platform and representing that DeliverHealth wanted to purchase Single Path; (2) Clark's oral "employee-model purchase agreement" offer on March 28, 2021; (3) Martin's August 2021 assurance that DeliverHealth was committed to the purchase agreement; (4) Clark's offer on December 2, 2021, of $10 million in equity; and (5) Martin's statements in January and February 2022 that a written agreement was being prepared. Doc. No. 127-1 at 14–15; see also Doc. No. 2 ¶¶ 209–280. The Court takes each in turn.

In the first category, Single Path says that beginning November 19, 2020, Clark began "pressing [Single Path] to stop building the [Single Path Revenue-Integrity] Platform and SaaS

software designed and being built and instead integrate its assets into" DeliverHealth. Doc. No. 127-1 at 14. It further asserts that in December 2020 and January 2021, Clark "represented that [DeliverHealth] wanted to purchase" Single Path and its assets and knowledge. Id. Single Path argues that, in reliance on these statements, it signed the NDA and participated in the March 25–26 "all-hands" meeting. Id.

Single Path cannot show that these statements—Clark's "pressing" Single Path to focus on integrating with DeliverHealth or indicating that DeliverHealth "wanted to purchase" Single Path—are actionable. See Cummings, 244 F.3d at 21. Clark's statements encouraging Single Path to take certain actions, or stop taking others, are expressions of his opinion, not statements of fact susceptible of actual knowledge. See id. at 21–22 ("[A] representation is one of opinion 'if it expresses only (a) the belief of the maker, without certainty, as to the existence of fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgment.'" (quoting Restatement (Second) of Torts § 538A (A.L.I. 1977))). Single Path does not specifically identify the December and January statements in which Clark represented DeliverHealth "wanted to purchase" Single Path. Curran's declaration states that Clark "ma[de] it extremely clear . . . that [DeliverHealth] wanted to purchase [Single Path], its assets, and the knowledge of" its members. Doc. No. 123-76 ¶ 16. Clark's statement or implication that DeliverHealth "wanted to purchase" Single Path is a mere statement of expectation, not one of fact, and "[s]tatements of expectation, such as, 'We'll work with you,' do not support an action for common law fraud." Hogan v. Riemer, 619 N.E.2d 984, 988 (Mass. App. Ct. 1993); accord Masingill v. EMC Corp., 870 N.E.2d 81, 91 (Mass. 2007). Plus, Single Path has adduced no evidence that Clark's statement that DeliverHealth "wanted to purchase" Single Path was false when made. Cf. Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221 at 226 (D. Mass. 1990) (explaining "general rule" that

"statements promissory in nature and statements of conditions to exist in the future are not actionable" while noting rule is subject to exception "if at the time the defendant made the statement, he or she did not intend to carry out the promise" (collecting cases)). Curran further declares that Clark told Single Path that DeliverHealth had the "plumbing," "infrastructure," and client base into which Single Path's system could integrate. Doc. No. 123-76 ¶ 15. These are statements of fact—but Single Path does not contend that these statements were false. In short, Single Path has not identified any false statements of fact before March 2021 that could support its misrepresentation claims.[7]

As to the second category, any reliance on the March 28, 2021, purchase agreement was unreasonable and unjustifiable as a matter of law. The Court has explained that the material terms of that supposed agreement were undefined, and the parties were engaged in negotiation in contemplation of a finalized written contract. Under these circumstances, Single Path "could not reasonably rely on a representation of an intention to draw up and execute a mutually acceptable [contract] when essential terms of it had not yet been stated or settled." Saxon Theatre Corp. of Bos. v. Sage, 299 N.E.2d 241, 244–25 (Mass. 1964); see also, e.g., Gattineri v. Wynn MA, LLC, No. 18-cv-11229-FDS, 2022 WL 123892, at *13 (D. Mass. Jan. 13, 2022) ("[T]he essential term of the alleged agreement between [the parties] was imprecise and undecided. . . . [Plaintiff's] claimed reliance on defendants' representations was unreasonable as a matter of law.").

[7] DeliverHealth contended at oral argument, for the first time, that it could not be held liable for Clark's statements before March 2021 because DeliverHealth did not exist at the time those statements were made. This argument is not entirely supported by the summary-judgment record, which shows that DeliverHealth Solutions LLC was formed in November 2020 (though not formally launched with Clark as its CEO until March 2021). Doc. No. 128-1 ¶¶ 32–34; Doc. No. 97-61 at 4. The Court need not definitively resolve this issue in light of its grant of summary judgment for DeliverHealth on the misrepresentation claims.

Single Path fails to support its misrepresentation claims arising from the third category—Martin's August 2021 assurance that DeliverHealth was "committed" to the March 28 purchase agreement—for several reasons. First, to the extent Single Path's reliance on this assurance turned on the oral purchase agreement itself, that reliance was unreasonable and unjustified as a matter of law for the reasons stated above. Second, Single Path does not adduce evidence of what, specifically, Martin said. A generic statement that DeliverHealth remained "committed" to the March 28 agreement is too vague to support a claim for fraud. See Masingill, 870 N.E.2d at 91 (holding statement that employee would be "made whole" at a future "review" was too vague to support fraudulent misrepresentation claim). Third, Single Path does not identify which actions (if any) it took, or abstained from taking, in reliance on Martin's August 2021 assurance. See Doc. No. 127-1 at 14–16. Single Path's failure to adduce evidence of any detrimental reliance traceable to Martin's August 2021 statement is fatal to its misrepresentation claims.

Single Path's failure to identify any detrimental reliance also dooms its claims as to the fourth and fifth categories of statements. Single Path asserts, in conclusory fashion, that these representations were "fraudulent or negligent statements on which [Single Path] reasonably relied." Id. at 16. Labels and assertions are no substitute for evidence of the elements on which Single Path would bear the burden at trial. See Celotex Corp., 477 U.S. at 322; Prescott, 538 F.3d at 39. Moreover, Single Path does not attempt to connect the statements to actions it took or forwent to its detriment—let alone support that connection with record evidence. See Doc. No. 127-1 at 14–16; see also Greene v. Philip Morris USA Inc., 208 N.E.3d 676, 684 (Mass. 2023) ("[P]laintiffs seeking to prove reliance must do more than introduce evidence that falsehoods were in the air, however pervasively: they must establish causation by proving that they themselves relied on those falsehoods.").

Single Path has not raised a jury issue, for any statement, on its misrepresentation claims. The motion for summary judgment is ALLOWED as to Counts I and II.

C. Count IV: Breach of Nondisclosure Agreement

The sole question for Count IV is whether a reasonable jury could conclude DeliverHealth breached the parties' mutual nondisclosure agreement. The answer is no.

DeliverHealth advances two main arguments why it is entitled to summary judgment on the breach-of-NDA claim: (1) Single Path has presented no evidence that DeliverHealth has ever "used" Single Path's confidential information for a purpose beyond the scope of the NDA's purpose; and (2) the sole third-party disclosures of Single Path's information were done with Single Path's knowledge and consent.[8] Doc. No. 96-1 at 21.

Single Path does not meaningfully respond to the first contention. See Doc. No. 127-1 at 16–17. It asserts that "a reasonable jury could find [DeliverHealth] breached the NDA by using and disclosing [Single Path's] trade secrets after it had agreed to acquire [Single Path] and then retaining and exploiting those secrets even after it refused to acquire [Single Path]—conduct far outside the NDA's limited 'evaluation' purpose." Id. at 16. Single Path offers no factual support for this legal argument. Single Path cites four statements of fact, each containing the definition of one of Single Path's alleged trade secrets—and nothing else. Id. (citing Doc. No. 128-1 ¶¶ 114, 139, 141, 157). Just as conclusory allegations and unsupported speculation are inadequate to stave off summary judgment, pointing to "the mere existence of a scintilla of evidence is also not enough." John B. Cruz Constr. Co., 169 F.4th at 95 (citation modified).

[8] DeliverHealth also argues that the NDA did not cover Ross and Pollock's employment and thus could not be breached by their termination. Doc. No. 96-1 at 21 n.8. Single Path does not respond to this argument. See Doc. No. 127-1 at 16–17. It is undisputed that the NDA did not require DeliverHealth to employ Ross and Pollock nor did it otherwise govern their employment. Doc. No. 128-1 ¶ 44; see also Doc. No. 123-32. DeliverHealth's termination of Ross and Pollock breached no term of the NDA.

Single Path has not carried its burden to "highlight specific facts showing that a trier of fact could reasonably find in its favor" that DeliverHealth used its confidential information beyond the NDA's purpose. Id. (citation modified).

In response to DeliverHealth's second argument, Single Path homes in on the period after the March 28 oral purchase agreement and contends that DeliverHealth disclosed, and fraudulently induced it to disclose, its trade secrets to third parties, namely "Presidio (and others)." Doc. No. 127-1 at 16–17. (Single Path makes no argument about the use or disclosure of any non-trade-secret information covered by the NDA, to the extent any exists. See id.)

Single Path's argument is not supported by the summary-judgment record. Most importantly, Pollock's and Ross's declarations state that they did not provide any Single Path intellectual property to Presidio, despite Martin's urgings. Doc. No. 123-75 ¶ 59; Doc. No. 123-77 ¶ 64. Single Path points to no evidence that its trade secrets were disclosed to Presidio. And Single Path makes no attempt to support its assertion that its trade secrets were disclosed to any "other[]" third parties. Even if Single Path did agree to disclose its trade secrets to third parties, the NDA deemed information "disclosed with the prior written approval of the Disclosing Party" not to be "confidential" within the contract's meaning. Doc. No. 123-32 ¶ 4.

Single Path also argues that a reasonable jury could find "fraudulent inducement" because Single Path shared its trade secrets under the belief that DeliverHealth was acquiring it, or "promissory/detrimental reliance" for the same. Doc. No. 127-1 at 17. These arguments are underdeveloped and do not clearly relate to whether DeliverHealth breached the NDA.

For all these reasons, the motion for summary judgment is ALLOWED as to Count IV.

D. Count V: Promissory Estoppel

As an alternative to Count III, Single Path raises a promissory-estoppel claim. Under Massachusetts law, promissory estoppel requires "(1) a representation intended to induce

reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." Columbia Plaza Assocs. v. Ne. Univ., 227 N.E.3d 999, 1015–16 (Mass. 2024) (citation modified). "A promissory estoppel claim is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration." Id. at 1016 (citation modified). "An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation." R.I. Hosp. Tr. Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1178 (Mass. 1995). Statements of intent and agreements to negotiate are not "unambiguous promises" in the contractual sense required for a promissory-estoppel claim. Columbia Plaza Assocs., 227 N.E.3d at 1016.

Single Path's promissory-estoppel claim fails for many of the same reasons Counts I through III fail. First, to the extent Single Path relies on Clark's statements before March 28, 2021, urging Single Path to integrate with DeliverHealth and representing that DeliverHealth wanted to purchase Single Path, see Doc. No. 2 ¶¶ 319, 321, those are statements of intent, not the kind of "unambiguous promise" that could "give rise to a 'contract' by virtue of reliance." R.I. Hosp. Tr. Nat'l Bank, 647 N.E.2d at 1179.

Second, as explained above, no reasonable jury could find that Single Path's reliance on the parties' oral purchase agreement (either on March 28 or December 2) was reasonable, given that the parties clearly remained engaged in negotiations in expectation of a finalized written contract. See id. (explaining there was no "'promise' in a contractual sense" where claim "was that the bank made an oral 'promise' which the bank did not intend, and [the other party] did not understand, to be a commitment because both parties contemplated a written agreement that

would govern the intricacies of a $43,500,000 construction loan"). And even if Clark had made an unambiguous promise to purchase Single Path (and he did not), he lacked actual or apparent authority to bind DeliverHealth to that acquisition. See, e.g., Bloomberg, 174 N.E.2d at 441–42.

Finally, although Single Path alleges DeliverHealth "promised to formalize its promises in a written agreement between the parties," Doc. No. 2 ¶ 322 (emphasis added), the summary-judgment record establishes that Clark repeatedly told Curran that Clark, Martin, and Yella Manchali were working to craft a term sheet, letter of intent, and final, written purchase agreement to "take to AHP," that they were having "valuation challenges," and that there was "legal work to be done," Doc. No. 128-1 ¶¶ 210–214. These statements do not amount to an enforceable "promise" to reach a written agreement.

In short, Single Path has not raised a genuine issue of any material fact as to its promissory-estoppel claim. The motion for summary judgment is ALLOWED as to Count V.

E. Count VI: Breach of the Covenant of Good Faith and Fair Dealing

Under Massachusetts law, every contract is subject to an implied covenant of good faith and fair dealing. Axis Ins. Co. v. Barracuda Networks, Inc., 160 F.4th 1, 10 (1st Cir. 2025) (citing Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991)). The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (citation modified). The implied covenant "may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005) (citation modified). "The scope of the covenant is only as broad as the contract that governs the particular relationship." Id.

"[I]f no contract exists, there can be no derivative implied covenant of good faith and fair dealing claim." John B. Cruz Constr. Co., 169 F.4th at 99 (citation modified). Because the

parties did not form a contract for DeliverHealth's acquisition of Single Path, see supra section III.A, DeliverHealth is entitled to summary judgment on Count VI insofar as that claim derives from the alleged purchase agreement.

The covenant of good faith and fair dealing is implied in the parties' NDA. Single Path does not show, on the summary-judgment record, that DeliverHealth engaged in conduct that had the "effect of destroying or injuring the right of [Single Path] to receive the fruits of the [NDA]." Axis Ins. Co., 160 F.4th at 10 (citation modified). Single Path alleges that DeliverHealth breached by (1) "knowingly misappropriating [Single Path's] property and services despite executing a non-disclosure agreement," (2) "repeatedly providing misleading information on which [Single Path] relied," and (3) "secretly purchasing a third-party entity in an effort to form a competing business." Doc. No. 2 ¶¶ 347–349. But it has not pointed to evidence that supports these allegations, as it must to survive summary judgment.

First, as the Court noted above and further explains below, see supra section III.C; infra section III.F, Single Path has not adduced evidence from which a reasonable jury could conclude that DeliverHealth misappropriated its trade secrets or other confidential information, either internally or through third-party disclosures. Ross and Pollock did not share Single Path's intellectual property with Presidio, and Single Path has not pointed to other third-party disclosures of its sensitive information that violated the letter or spirit of the NDA.

Second, the Court has already explained that no reasonable jury could conclude, on this record, that Single Path reasonably relied on any false statements of material fact made by DeliverHealth. See supra section III.B. The same reasoning applies here. Single Path argues that DeliverHealth fraudulently induced Single Path to share or permit the sharing of its trade secrets with third parties, Doc. No. 127-1 at 17, but it was unreasonable as a matter of law for

Single Path to rely on the March 28 oral purchase agreement, and Single Path has shown no other false statement of fact on which it reasonably relied when sharing that information (if, indeed, it shared any protected information).

Third, Single Path makes no attempt to show that DeliverHealth's purchase of a different company (presumably Presidio) deprived it of the benefit of the NDA. Single Path does not show the parties had any exclusivity agreement, and the NDA by its terms did not "limit[] either Party or its Affiliates from entering into any business relationship." Doc. No. 123-32 ¶ 9.

The motion for summary judgment is ALLOWED as to Count VI.

F. Counts VII and VIII: Misappropriation of Trade Secrets

The parties treat Single Path's trade secrets claims, arising under the Colorado Uniform Trade Secrets Act ("CUTSA") and the federal Defend Trade Secrets Act ("DTSA"), as rising or falling together, Doc. No. 96-1 at 23–28; Doc. No. 127-1 at 18–23, and the Court follows suit.

The DTSA "identif[ies] three theories of misappropriation: (1) acquisition, (2) disclosure, or (3) use." Cashman Dredging & Marine Contracting Co., LLC v. Belesimo, 759 F. Supp. 3d 120, 145 (D. Mass. 2024) (citation modified); see also 18 U.S.C. § 1839(5); Colo. Rev. Stat. § 7-74-102(2) (providing same definition of "misappropriation"). In addition to the unauthorized use or disclosure of trade secrets, the law proscribes the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(5)(A), (6)(A); Colo. Rev. Stat. § 7-74-102(1), (2)(a).

Single Path identifies eight alleged trade secrets. Doc. No. 128-1 ¶¶ 92, 105, 114, 120, 139, 143, 149, 157. DeliverHealth argues that Single Path has adduced no evidence it has "used"

any of the eight trade secrets.[9] Doc. No. 96-1 at 26. Single Path does not attempt to counter DeliverHealth's argument, instead stressing that the law prohibits acquisition by improper means, not just "use." Doc. No. 127-1 at 18–19. Neither party argues that DeliverHealth did or did not unlawfully "disclose" Single Path's trade secrets. Single Path's failure to show DeliverHealth unlawfully disclosed its trade secrets dooms this theory, and in any event the summary-judgment record reveals no unlawful disclosure.

As a result, Single Path's theory of trade-secret misappropriation is a narrow one: that DeliverHealth acquired its trade secrets by improper means. Id. at 19. Specifically, Single Path argues DeliverHealth acquired its trade secrets through fraudulent or negligent misrepresentation and/or through breach of the parties' purchase agreement or NDA. Id.

In other words, Single Path's trade-secret misappropriation claims depend on the same liability theories the Court rejected above. Single Path has not pointed to any false statements of fact on which it reasonably and justifiably relied in sharing its trade secrets. The parties never formed a purchase agreement, and the trade secrets could not have been improperly obtained through breach of a nonexistent contract. Single Path shared the alleged trade secrets under the parties' NDA, and Single Path has not shown any breach of that NDA. Single Path cannot show DeliverHealth used "improper means" to acquire its trade secrets for all the same reasons it fails to support its misrepresentation and contract claims.

The motion for summary judgment is therefore ALLOWED as to Counts VII and VIII.

[9] DeliverHealth also argues that Single Path has not identified four of its trade secrets with sufficient particularity. Doc. No. 96-1 at 26–28. The Court need not resolve this issue in light of its grant of summary judgment for DeliverHealth on both trade-secret misappropriation claims.

G. Count IX: Unjust Enrichment

Finally, Single Path asserts an unjust-enrichment claim. Under Massachusetts law, an unjust-enrichment claim has three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009)). Equitable concerns are paramount. See Mass. Eye & Ear, 552 F.3d at 57.

DeliverHealth argues it is entitled to summary judgment because Single Path cannot show DeliverHealth used Single Path's trade secrets, which DeliverHealth characterizes as the only "benefit" Single Path allegedly conferred on DeliverHealth. Doc. No. 96-1 at 28; Doc. No. 135-1 at 10 n.9. But DeliverHealth has not grappled with the other benefits Single Path and its members conferred, including: the "thousands" of hours of training, the analysis evaluating other DeliverHealth business opportunities, and the other support the members provided while they were not DeliverHealth employees. Doc. No. 127-1 at 23; see also, e.g., Doc. No. 123-75 ¶¶ 40–41; Doc. No. 123-76 ¶ 79; Doc. No. 123-77 ¶ 27. Single Path contends these services transferred their members' knowledge about revenue integrity—an area in which DeliverHealth did not operate at its inception but now does. See Doc. No. 127-1 at 23. DeliverHealth does not respond to these arguments or otherwise address these bases for Single Path's unjust-enrichment claim. See Doc. No. 96-1 at 28; Doc. No. 135-1 at 10 n.9.

Summary judgment for DeliverHealth is warranted to the extent Single Path's unjust-enrichment claim relies on DeliverHealth's "use" of its trade secrets, for all the reasons explained under Counts VII and VIII. But it is not warranted as to the uncompensated benefits Single Path's members conferred on DeliverHealth, specifically, those benefits Ross and Pollock

conferred before they were hired by DeliverHealth and the benefits Curran conferred before Clark told him DeliverHealth would not go forward with Single Path. The motion for summary judgment is therefore ALLOWED IN PART as described herein as to Count IX.

H. Motions in Limine

Also pending before the Court are three motions to exclude certain expert opinions. Doc. Nos. 99, 102, 106. DeliverHealth moves to exclude, under Rule 702, the opinions of Single Path's trade-secrets rebuttal expert, Monty Myers, as (among other things) unhelpful for the factfinder. Doc. Nos. 102, 103-1; see also Doc. No. 104-1 (Myers rebuttal report). With no trade-secrets claims remaining, the Myers rebuttal report is irrelevant and would not aid the factfinder, and the motion to exclude it (Doc. No. 102) is ALLOWED.

DeliverHealth also moves to exclude, under Rule 702, the opinion of Single Path's damages expert, Philip Green, arguing that Green's opinion is unhelpful for the factfinder because it fails to disaggregate damages at a claim-by-claim level. Doc. Nos. 99, 100-1; see also Doc. No. 101-6 (Green report). Aside from unjust enrichment, Green's damages opinion is no longer relevant for trial because DeliverHealth is entitled to summary judgment on all other claims. As for unjust enrichment, Green's analysis does not attempt to value the non-trade-secret benefits Single Path allegedly conferred on DeliverHealth. See Doc. No. 101-6 ¶¶ 77–78, 111. Green's opinion would not help the factfinder determine the sole remaining issue within the scope of his opinion: the value of the benefits Single Path conferred aside from DeliverHealth's use of its trade secrets. The motion to exclude (Doc. No. 99) is therefore ALLOWED.

Single Path moves to exclude the rebuttal opinion of M. Timothy Renjilian, which DeliverHealth offers to rebut Green's report. Doc. Nos. 106, 107-1; see also Doc. No. 111-3

(Renjilian rebuttal report). The motion to exclude (Doc. No. 106) is ALLOWED solely because the Court has excluded the expert opinion Renjilian was retained to rebut.[10]

## IV. CONCLUSION

For the foregoing reasons, DeliverHealth's motion for summary judgment (Doc. No. 95) is DENIED IN PART as to Count IX and is otherwise ALLOWED. The motions in limine (Doc. Nos. 99, 102, 106) are ALLOWED.

The parties submitted all exhibits under seal, and the publicly filed versions of their memoranda and statement of facts are heavily redacted. The Court perceives nothing in its Order warranting sealing. In an abundance of caution, however, the Court will place this Order under seal for seven days. The Clerk shall unseal the Order on July 31, 2026, unless either party first files a motion to redact one or more portions of the Order. Such a motion must identify the sensitive portions with particularity and show good cause for the requested redactions sufficient to overcome the strong presumptive right of public access to judicial filings. See, e.g., Bradford & Bigelow, Inc. v. Richardson, 109 F. Supp. 3d 445, 447–48 (D. Mass. 2015) (Zobel, J.).

By August 14, 2026, the parties shall submit a joint status report stating their joint or separate positions as to: (1) how long trial will last, when the parties will be ready, and whether trial is by jury, and (2) whether the parties request a referral to the Court's mediation program.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

[10] Single Path's request to exclude two documents on which Renjilian's rebuttal report relied (Doc. No. 106 at 8) is DENIED WITHOUT PREJUDICE to Single Path raising this issue before trial to the extent it remains relevant.